PROVO STY, J.
Plaintiff sues the defendant company in damages, in her own behalf and that of her minor children, for the death of her husband, father of the children, who was struck by a locomotive of the defendant company as he was passing over a crossing.
The defense is that there was no negligence on the part of the defendant company, but that the accident was due entirely to the negligence of the decedent, who did not stop, look, and listen before going upon the track.
' The train was composed of locomotive and tender, 20 freight cars, caboose, and one passenger coach, in the order here mentioned. It was in the act of stopping for a station, but had as yet only taken off steam and slackened speed; for it was not to come to a full stop until the hindmost car had reached the station, and, as the length of the train was 800 to 1,000 feet, and the crossing was only 312 feet beyond the station, the rear car would not be at this desired spot until' the locomotive had gone 500 to 600 feet beyond the crossing.
The decedent and another man were on the front seat of a two-horse wagon; the companion driving. They were going northeast, and the train was going northwest, so that, for seeing the train, they would have had to look over their right shoulder, and they were on the left, or fireman’s, side of the locomotive, not on the engineer’s. In approaching this crossing, they had an unobstructed view for over a mile down the track, until they reached a point about 150 feet from the crossing, when a building, known as the Harville store, and the depot intervened, and obstructed their view. When they had passed these obstructions, which would be when they reached a point 54 feet from the track, the locomotive would be visible, as it passed the north end of the depot, and they would become visible to the occupants of the locomotive. Unaware of the nearness of the train, they drove right ahead upon the crossing in a trot, without looking to see if a train was not coming, and without stopping to listen, being absorbed in a conversation about a new building that was in course of construction near by. They would have passed over safe, but one of the horses became frightened at the approaching locomotive, *36 and balked and stopped. The driver first sought to whip him on, and struck him one or more times with a switch, but, seeing the nearness of the locomotive, jumped, and saved himself. The decedent remained in the wagon. The locomotive struck it at the hind wheel, and demolished it. The decedent died of his injuries in about an hour.
There is no contention that the train was not properly equipped or in good condition, or that it was being run at negligent speed, or that the engineer did not do all he could to stop it after he had seen the wagon. The contentions are that the bell was not rung and the whistle blown in approaching this crossing, and that the fireman and engineer were not keeping a proper lookout.
[1] If it were conceded that the whistle was not blown in approaching this crossing, this would not entitle plaintiff to recover, since this act of negligence would have preceded that of the decedent in going thus recklessly upon the track, and therefore would not have been the sole proximate cause of the accident. Blackwell v. St. Louis, Iron Mountain & Southern Railway Co., 47 La. Ann. 268, 16 South. 818, 49 Am. St. Rep. 371.
[2] Plaintiff can recover, if at all, only under the last clear chance doctrine; that there was yet time, after the horses had balked, and the occupants of the wagon had become helpless, to have stopped the train, if those in charge of the locomotive had been keeping a proper lookout. '
How near the locomotive was when the wagon went upon the crossing is variously stated by the witnesses. The driver of the wagon says that, as he went upon the track he saw the locomotive south of the depot. Plaintiff’s witness Clark, who was on the gallery of the Harville store, 90 feet south of the crossing, says that the locomotive “-was just passing the depot.” Plaintiff’s witness Shaughnessy, who was on the same gallery, says that “the wagon drove upon the track about the time the engine was passing the depot,” and says also that the horses balked when the locomotive was passing the depot. He also says:
“I saw the train coming, and directly I saw I heard the train blow three short whistles, and directly I saw the man jump out of the wagon, and then the train struck the wagon.”
He was asked:
“Did it not occur to you, when these men drove upon the track, that they were in a dangerous situation? A. I thought at the rate the train was going it was pretty risky. Q. You thought it was imprudent of them? A. Yes, sir.”
Plaintiff’s witness Teckle was standing some 20 feet north of the depot. He says that, when he first saw the wagon, it was standing on the crossing, and the driver was whipping the horses, and that the locomotive was then opposite him. The powers of observation of this witness were evidently not of the best. He could not tell whether the train was a long one. Plaintiff’s witness Cox was between the station and the Harville store, about 20 feet from the store.
“Q. You were there when the train came up to - the depot? A. Yes, sir. Q. Standing still holding your horse? A. I was trying to hold her; I was not standing still, for the horse was rearing. Q. Your horse was cutting up pretty badly? A. Yes, sir; it was frightened at the locomotive.”
The powers of observation of this witness were much greater than those of the witness Teckle, for, while holding this frightened horse, which was rearing and cutting up pretty badly, he managed to observe in the same instant of time that the horses had balked on the track, and that the locomotive had then not yet passed the depot. This witness says that, when the locomotive passed him, the fireman had his head out of the window and was looking back to the rear of the train, and that the engineer was looking at the fireman. Defendant’s witness Beard stood about 100 yards southwest of *38 the crossing, and was looking at the train when, the sound of the whistle attracting his attention, he saw the wagon on the track. He thinks that the locomotive was, at that moment, about 120 feet from the crossing. Plaintiff’s witness O. H. Rawles says that he was holding his horse at the Harville store; that, when the wagon drove upon the track, the locomotive was passing the depot. Plaintiff’s witness J. F. Rawles was on the store gallery. He says that, when the horses balked, the locomotive was at or near the depot. That it whistled “when it came right along by the station.” Defendant’s witness Moore says that he was on the cowcatcher, and saw the wagon coming to the crossing; that he supposes it was then about 20 steps from the track; and that the locomotive was then about a car length beyond the depot. Two witnesses of plaintiff testify, however, that from the store gallery, where they were, they observed the locomotive passing, and did not see this man on the cowcatcher. The engineer says he was 4 or 5 car lengths (or, say, 160 to 200 feet) from the crossing when the fireman said to him:
“There is a wagon going on the crossing.”
That he saw the wagon about the time the fireman spoke. That he had already blown his whistle for the crossing. That he was looking ahead; but that, when he got within 7 or 8 car lengths from the crossing, his vision of the opposite side of it, or that on which the wagon was coming, was obstructed by the boiler. The fireman says that, as he was passing the depot, he looked up the track and saw nothing on it. He admits that he was at that time dividing his attention between his two duties of looking ahead and looking back to watch the signals of the brakeman, who was on the rear car, and was to signal him when to bring the train to a final stop. The witnesses estimate the speed of the train variously; some putting it as high as 15 miles an hour.
Upon these facts, the learned counsel for plaintiff argue that, if those in charge of the locomotive had been keeping a proper lookout, they would have seen the wagon upon the track by the time the locomotive passed the station, and that there would have been ample time to have stopped the train, as is demonstrated by the fact that the train was actually stopped when only the engine and tender' and two cars had passed the crossing.
We are not convinced by this argument. The train was moving at considerable speed, and traveling many feet every second. The view of the engineer was obstructed by the boiler, until the wagon got actually on the track. The fireman had a double duty to perform. He had to keep a lookout ahead, and, at the same time, to observe the signals of the brakeman on the rear coach. He says that, in doing this, he turned his head as fast as he could in order to look both ways. We have no good reason for not believing this statement of his. It is quite possible that this may have caused him to see the wagon a second or so later than he might otherwise have done. The wagon itself was moving with some speed, and took but a few seconds to get upon the track after it had got in sufficient proximity to it for the fireman to become aware that it was about to do so. This was a long and heavy train; 17 of the freight cars were loaded. We are not satisfied that this heavy train could have been stopped in time to avoid the accident, no matter how diligent those in charge of it might have been. The case of plaintiff depends upon a rather nice, or close, computation of number of feet and degree of speed, based upon the observation of witnesses necessarily more or less inaccurate in a case of fast moving bodies. Whereas, on the side of defendant we have this decedent going *40 recklessly upon this track right in front of this approaching train.
We are much inclined to believe, with defendant’s learned counsel, that what caused the horse to balk was the close proximity of the locomotive, and that the locomotive must have been very close, as otherwise there would have been no occasion for the horse to balk.
The judgment appealed from -is set aside, and the suit of plaintiff is dismissed at her cost.